UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x   Case No. 8-09-78895 (REG)
                                                                            Chapter 13

GEORGIOS STAMOU,
                              Debtor.
------------------------------------------------------------------------x

## MEMORANDUM DECISION

Before the Court is the issue of whether Georgios Stamou (the "Debtor") is liable for debts incurred by a limited liability company, Devine Media Group LLC ("DMG"), of which he is the owner and principal employee. Genevieve Rossiello ("Rossiello") commenced an action against DMG in state court seeking a judgment in the amount of $328,000. In the action before this Court, Rossiello is seeking to establish that the Debtor is responsible for the debts of DMG and that those debts are valid, enforceable claims that must be provided for in the Debtor's chapter 13 plan.

The Court believes that properly formed and administered corporate vehicles, which provide a mechanism to limit the personal liability of investors who willingly risk capital, play a critical role in our economic system. Individuals may operate through business structures such as corporations or limited liability companies; however, when these vehicles are used for illegitimate purposes, the individuals responsible should not be permitted to insulate themselves from the consequences of their fraudulent conduct. It is appropriate and necessary to pierce the shield that insulates individuals from the liabilities of their companies when the company's owner is abusing the corporate form.

In order to succeed in piercing the corporate veil, Rossiello must show that 1) the owner "exercised complete domination of the corporation in respect to the transaction attacked" and 2)

"such domination was used to commit a fraud or wrong against the plaintiff which resulted in injury." *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993). It is important to note that in applying New York law, the moving party must establish that a wrong has been committed before a corporate veil may be pierced.

Rossiello and DMG[1] entered into an agreement whereby DMG would create a film based upon a script provided by Rossiello. Rossiello in turn agreed to finance the venture. While DMG and Rossiello did not have a written agreement regarding how the funds could be used, the Court concludes that DMG surpassed all boundaries of plausible uses for Rossiello's money when DMG admittedly diverted money from the venture for the Debtor's personal use. DMG is liable for the harm to Rossiello. Since the Court finds that the Debtor dominated DMG and used DMG to perpetrate this wrong against Rossiello, the Court will pierce the corporate veil of DMG and hold the Debtor liable for DMG's wrongdoing. At this time the Court is not making a determination as to the amount of the Debtor's liability or the dischargeability of Rossiello's claim.

*Jurisdiction*

This Court has jurisdiction over this core proceeding under 28 U.S.C. sections 157(b)(2)(J) and 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This Memorandum Decision contains this Court's findings of fact and conclusions of law to the extent required by Bankruptcy Rule 7052.

---

[1] For purposes of this Memorandum Decision, when there is discussion of DMG's acts or contracts, it should be understood to mean that the Debtor has acted or entered into the contract on behalf of DMG.

*Procedural History*

On November 18, 2009, the Debtor filed a petition under chapter 13 of the Bankruptcy Code. On July 16, 2010, the Debtor confirmed a 100% plan. The Debtor is an owner of DMG.

On February 17, 2009, Rossiello commenced an action against DMG by filing a Summons and Complaint in the Supreme Court of the State of New York, County of Suffolk ("State Court Action"). The complaint asserts that, upon information and belief, DMG failed to repay funds given to it by Rossiello to produce a film, despite Rossiello's demands for repayment. Furthermore, the complaint alleges that (i) DMG has been unjustly enriched in the sum of $328,000; (ii) DMG willfully deceived Rossiello causing her damage in the amount of $328,000; (iii) DMG breached its fiduciary duty to act in good faith and in Rossiello's best interests, and improperly retained the funds; and (iv) DMG unlawfully exercised dominion over the funds, converting the funds to its own use and benefit, without the knowledge, consent, or authority of Rossiello.

On July 28, 2010, Rossiello took the Debtor's deposition in the State Court Action. On or about October 12, 2010, Rossiello sought to add the Debtor to the State Court Action as an additional defendant. However, Rossiello was informed that the Debtor had filed a bankruptcy petition, and thus, Rossiello was prohibited from joining the Debtor in the State Court Action due to the automatic stay that went into effect pursuant to 11 U.S.C. section 362(a).

On April 14, 2011, after the Debtor's plan was confirmed, Rossiello filed a motion seeking relief from the automatic stay to permit Rossiello to add the Debtor as a defendant in Rossiello's State Court Action against DMG. Rossiello argued that the Debtor was a necessary party because the Debtor is the principal employee and 50% owner of DMG. Rossiello claims

that the joinder of the Debtor in the State Court Action is essential for the purpose of determining whether or not the Debtor is personally liable to Rossiello and, if it is so determined, to fix the amount of her claim against the Debtor in the State Court Action. Rossiello asserts that the Debtor and DMG are both responsible for defrauding Rossiello and for breaching fiduciary duties to Rossiello. During a hearing before this Court on the motion for relief from stay, both parties agreed that it would be beneficial for this matter to be resolved by this Court, as a contested matter. This Court is to determine whether the Debtor is liable to Rossiello.

On May 10, 2011, Rossiello and the Debtor entered into a stipulation, which was so ordered by this Court. In the stipulation, the parties agreed that if the Debtor is found to be personally liable to Rossiello under a veil-piercing theory, then Rossiello is authorized to file a late claim in the Debtor's bankruptcy case. Pursuant to the stipulation, such claim will be allowed as if it had been timely.[2] It was further stipulated that if a claim is filed, the Debtor will not object to the claim on the basis of timeliness. The Debtor did not waive his right to object to Rossiello's claim on any other basis. The parties also agreed that the State Court Action would be held in abeyance pending the determinations of this Court.

On December 8, 2011, Rossiello filed a motion for summary judgment[3] (i) determining that DMG and the Debtor are one and the same; (ii) determining that the Debtor is personally liable for DMG's obligation to Rossiello; (iii) determining that Rossiello's claim should be dealt with in the Debtor's chapter 13 plan; (iv) fixing the amount due to Rossiello at $328,000; and (v) for such other, further, and different relief as this Court deems just and proper. The Debtor

---

[2] Rossiello was not scheduled as a creditor in the Debtor's petition.
[3] This is a contested matter pursuant to Fed. R. Bankr. P. 9014. Therefore, summary judgment is applicable pursuant to Fed. R. Bankr. P. 9014(c), notwithstanding the fact that no adversary proceeding has been filed in this matter.

opposed this motion stating that there were material issues of fact in dispute, which required an evidentiary hearing.

On February 28, 2012, the Court scheduled an evidentiary hearing on Rossiello's motions for relief from the automatic stay and summary judgment in this contested matter. A hearing was held to determine whether the Debtor is personally liable for DMG's debts to Rossiello under a veil-piercing theory. The Court heard testimony by Rossiello, Robert San Filippo ("San Filippo"), and the Debtor, and admitted Rossiello's Exhibits 1, 2, 4, 5, and 6 into evidence without objection. The parties did not file any post-trial briefs, and the Court took the matter under submission.

*Facts*

The Debtor is the principal employee and 50% owner of DMG. The remaining 50% of DMG is owned by the Debtor's wife. DMG is engaged in the business of producing television programs and movies. DMG also performs marketing campaigns, web design, and general designing for customers. DMG does not have any officers, directors or board, personnel, or full-time employees other than the Debtor. DMG, instead, uses independent contractors who are contracted for specific projects.

DMG was formed as a New York limited liability company on October 8, 2004. The office of DMG is located in the Debtor's home in Northport, New York. DMG has a checking account that is used for the business.

Rossiello owns the rights to a script for a motion picture project, tentatively titled, "Easy Street." Rossiello purchased the script, which is about a troubled child who is drawn into a life of organized crime. The script is based on Rossiello's husband, San Filippo, a self-proclaimed

former member of an organized crime family.  Prior to July 6, 2007, DMG represented to Rossiello that it had the knowledge, ability, resources and contacts to produce Easy Street as a feature film.  Rossiello claims that an agreement existed between Rossiello, San Filippo, and DMG for the production of Easy Street.  According to Rossiello, the parties agreed that Rossiello would provide funding for the costs of producing the film, including writers, production, film, and actors.  During her testimony, Rossiello could not identify any written agreement that explicitly provided restrictions on what DMG was permitted to do with Rossiello's funds.  The record before the Court is barren of any formal agreement between DMG and Rossiello setting forth DMG's obligations regarding how Rossiello's money was to be employed.  There is, however, testimony establishing an oral agreement between Rossiello and DMG.

Rossiello testified that on July 6, 2007, in reliance on statements by, and at the request of the Debtor, Rossiello had a family friend, Dr. Michael DiStefano, forward $200,000 to DMG for the production of Easy Street.  Preproduction of the film began on or about July 2007.  On February 12, 2008, Rossiello wired funds to DMG in the amount of $50,000, to be used toward the production of Easy Street.  On March 24, 2008, Rossiello had another family friend, Adrian Garofalo, send $40,000 to DMG for production of Easy Street.  On April 16, 2008 and April 24, 2008, Adrian Garofalo's company, E/O Media Productions, wired more funds to DMG, in the sums of $32,000 and $6,000, to be used toward the production of Easy Street.  In sum, $328,000 was paid to the Debtor on Rossiello's behalf in reliance on the Debtor's assertions that DMG could produce the film.[4]

Subsequently, on June 6, 2008 and June 9, 2008, San Filippo sent DMG $9,000 and $6,000, respectively, to pay a screenwriter to write an adaptation of the script for Easy Street.  It

---

[4] The funds were paid to DMG by Rossiello's friends under agreements that Rossiello was to pay the funds back to her friends.

is alleged that $343,000 disbursed to DMG for the production of Easy Street, was instead diverted by the Debtor to pay unrelated business and personal expenses.[5]

The Debtor created expense reports detailing his use of Rossiello's funds to pay for his insurance, mass transit, and other transportation expenses, movies, groceries, office supplies, a Netflix account, internet service, his cellular phone, his landline, attorney's fees, gasoline, hotels, bottled water fees, pet supplies, doctor bills, meals and entertainment, monthly office rent, federal and state income tax, and other federal and state fees.[6] Rossiello alleges that she never authorized the Debtor to use her funds to pay for 100% of the costs of operating DMG's office, particularly when DMG simultaneously had other ongoing projects with other clients. When questioned about the expense reports, the Debtor admitted that the phone bill and rent that were listed on the expense report for Easy Street, for example, were in fact the entire monthly amounts due for DMG's office, despite the fact that there were other ongoing projects. Tr. 2/28/12 at 75.

The Debtor's expense reports also reflected a transfer, in the amount of $143,811.49, from DMG's business checking account to the Debtor's personal savings account. Only $32,345 of this money was returned to DMG's account; the balance was not returned or accounted for by the Debtor. Tr. 2/28/12 at Exhibit 5-6. Additionally, the Debtor used Rossiello's funds on trips to Greece, Italy, Germany, and Arizona, allegedly to scout out locations for the movie. Rossiello's money was also used, apparently indiscriminately, for airfare, hotels, and travel expenses. On occasion, the Debtor withdrew Rossiello's money and made no attempt to even record it as an expense attributable to the project but instead recorded it as a cash withdrawal.

During the course of the project, San Filippo was in charge of handling the day-to-day communications with the Debtor concerning the project. DMG provided San Filippo with verbal

---

[5] The Plaintiff argued that more than $400,000 was actually paid to the Debtor. However, the Plaintiff believes that parts of the funds were spent legitimately and that only $343,000 was spent by the Debtor improperly.
[6] The state and federal fees include, for example, the statutory fees charged to DMG.

and written updates detailing how the funds were utilized. Some of the updates satisfied San Filippo, while others did not. San Filippo discussed all issues regarding the updates with the Debtor. While San Filippo often voiced concerns about how the funds were being utilized or the progression of the project, there were never any writings to evidence the displeasure. When San Filippo was not satisfied with various expenditures or the project's progression, the Debtor would routinely explain that the film project was making progress. However, despite demands for a written accounting, Rossiello and her husband did not receive a written accounting of how the money was spent until after the commencement of the State Court Action. DMG never produced any part of the film, and no money was ever returned.

## *Discussion*

### A. The Limited Liability Company's Harm to the Plaintiff

The harm alleged by Rossiello is that DMG defrauded Rossiello when DMG converted $143,811.49 of her funds by transferring them to the Debtor's personal account and failed to use the remaining funds towards legitimate expenses for the film. DMG counters that it used all of Rossiello's funds in connection with the production of Easy Street. DMG essentially argues that because there was no written agreement detailing how it could spend the money, it was therefore free to use the subject funds in any manner it decided and for any purpose it chose. This Court, as previously stated, respects the freedom to contract and recognizes the importance of creating contracts to define the boundaries of transactions. Since there was no written contract here stating what expenditures were permissible, this Court will not consider the legitimacy of each individual expenditure at this time.

However, this Court has determined that DMG has not satisfied its implied duties of good faith and fair dealing under the oral agreement with Rossiello. All contracts have implied duties of good faith and fair dealing, and oral agreements are enforceable. *Jaffe v. Paramount Commc'ns Inc.*, 644 N.Y.S.2d 43, 47 (App. Div. 1996) ("Implied in every contract is a covenant of good faith and fair dealing."); *Metro-Goldwyn-Mayer, Inc. v. Scheider*, 347 N.Y.S.2d 755 (Sup. Ct. 1972) *modified sub nom. Metro-Goldwyn-Mayer Inc. v. Scheider*, 352 N.Y.S.2d 205 (App. Div. 1974). This Court finds that DMG breached its duties of good faith and fair dealing in its transactions with Rossiello. DMG transferred $143,811.49 from the bank account comprised of funds from Rossiello solely for use on the Easy Street project (the "Easy Street Account") into the Debtor's personal account without justification. Based on DMG's expense reports, the Debtor did not return to the Easy Street Account more than $32,345 of the $143,811.49 that DMG had transferred into the Debtor's personal account. *See* Tr. 2/28/12 at Exhibit 5-6. By the Debtor's own testimony, this amount was not income earned by the Debtor.[7] Tr. 2/28/12 at 70. Thus, $111,466 was taken from the Easy Street Account and used improperly by the Debtor for his own personal benefit. DMG violated the implied obligations of good faith and fair dealing when it transferred the money from the Easy Street Account to the Debtor for his own personal benefit. DMG's breach actually and proximately caused monetary harm to Rossiello.

DMG's act of unjustly taking money from the Easy Street Account meets the elements of the tort of conversion under New York law. To establish a conversion claim, the plaintiff must demonstrate that 1) she had an immediate superior right of possession; 2) to the identifiable fund;

---

[7] The Debtor stated that as a salary for his work on Easy Street, he received $15,000-$16,000 in total from Rossiello. Tr. 2/28/12 at 68.

3) the exercise by the defendant of unauthorized dominion over the money in question; 4) to the exclusion of the plaintiff's rights. *See Fitzpatrick House III, LLC v. Neighborhood Youth & Family Servs.*, 868 N.Y.S.2d 212, 213 (App. Div. 2008). Here, Rossiello had a superior right to the funds in the Easy Street Account, namely that those funds be used on Rossiello's behalf rather than for the personal benefit of the Debtor. DMG exercised unauthorized dominion over Rossiello's funds when DMG transferred Rossiello's funds to the Debtor's personal account without Rossiello's authorization. After the transfer occurred, Rossiello could not access the funds, and the funds were no longer used on her behalf. Even though there was no written contract specifying how the money was to be spent, DMG was obligated to use the funds for the benefit of the project. There is no evidence that $111,466 was used this way. Thus, DMG has committed the tort of conversion.[8] As a result, this Court concludes that DMG committed a wrong against Rossiello.

### B. Piercing the Corporate Veil to Hold the Owner-Debtor Liable for the Limited Liability Company's Debts

The primary issue before the Court is to determine whether the Debtor should be found liable for the debts of DMG. If the Debtor has no liability for the debts of DMG, then Rossiello can proceed with the State Court Action against DMG. However, if under New York law the Debtor has forfeited, by his actions, the protection of limited liability, then the parties have consented to this Court hearing the entire matter against the Debtor.

As a general rule, a corporation exists independently of its owners as a separate legal entity and a corporation's owners are not liable for the debts of the corporation. *See Anderson v. Abbott*, 321 U.S. 349, 361-63 (1944); *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135,

---

[8] In fact, DMG would likely have committed this tort even if DMG had transferred all of the money to the Debtor's personal account and then transferred it all back to the Easy Street Account. Here, DMG's transgressions were even more severe as most of the transfers were not returned to the Easy Street Account nor did the Debtor provide an accounting for the transfers.

140 (1993). Formation of a corporation by its owner for the purpose of limiting liability of the owner is perfectly legal and valid. *Morris*, 82 N.Y.2d at 140. However, New York courts will disregard the corporate form, or pierce the corporate veil, to hold a corporation's owners liable for the debts of the corporation whenever necessary to prevent an injustice or to achieve equity. *Id.* at 142.

Under New York law, a party seeking to pierce the corporate veil bears the burden of showing that 1) the owner "exercised complete domination of the corporation in respect to the transaction attacked" and 2) "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *See id.* at 141. "The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court of equity will intervene." *Id.* at 142.

The Second Circuit has enumerated a non-exhaustive list of factors relevant to determining whether a corporation has been "dominated" by its owners:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of the corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other [sic] of the corporation as if it were its own. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

No one factor is determinative and courts must conduct a broad-based inquiry into the totality of the facts to determine whether the party seeking to pierce the corporate veil has established the

domination prong of the test. *See id.*; *see also Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*, 395 B.R. 559, 564-65 (Bankr. E.D.N.Y. 2008) (finding defendant abused the corporate form based on the totality of the circumstances).

Under the second prong of the New York standard, the party seeking to pierce the corporate veil must also establish that the domination was used to commit "a wrongful or unjust act toward the plaintiff," which caused injury to the plaintiff. *Morris*, 82 N.Y.2d at 141-42. Actual or common law fraud need not be proven. *See DER Travel Servs. v. Dream Tours & Adventures*, No. 99-2231, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005).

In New York, courts use the same standard to pierce the veils of limited liability companies. *See Retropolis, Inc. v. 14th St. Dev. LLC*, 797 N.Y.S.2d 1, 2 (App. Div. 2005). The doctrine of piercing the corporate veil applies to limited liability companies just as it does to corporations. *See* N.Y. LTD. LIAB. CO. LAW § 609 (McKinney).

Here, Rossiello alleges that DMG and the Debtor are to be treated as one and the same. Rossiello argues that the corporate veil should be pierced, and that the Debtor should be held liable for the debts of DMG.

In contrast, the Debtor's position is that there was no contract stating what the Debtor could or could not do with the funds provided by Rossiello. The Debtor alleges that he was not bound to use the funds for any certain expenses. The Debtor also argues that regardless of any agreement regarding allowed expenses, the Debtor used all of the funds for legitimate expenses for the preproduction of Easy Street.

Both prongs of the standard for piercing the corporate veil, as found in *Morris* and further defined by the Second Circuit, have been met here. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *Morris v. State Dep't of*

*Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993). The first prong requires that "the owners exercised complete domination of the corporation in respect to the transaction attacked." *Morris*, 82 N.Y.2d at 141. The Court will analyze this "domination" element of piercing using the factors set forth in *Wm. Passalacqua Builders*, 933 F.2d at 139.

### *Absence of corporate formalities*

DMG does not observe any corporate formalities. According to the Debtor's testimony, DMG does not have any officers, directors or board, personnel, or full-time employees besides the Debtor. Tr. 2/28/12 at 62-63. DMG, instead, uses independent contractors who are paid on a 1099 basis. Tr. 2/28/12 at 62-63. These independent contractors are contracted for specific projects and have no affiliation with, or connection to, DMG otherwise. Tr. 2/28/12 at 62-63. The Debtor has been DMG's sole employee since its inception. Tr. 2/28/12 at 62-63. The Debtor receives a salary only when DMG is working on projects. Tr. 2/28/12 at 63.

DMG has a business checking account. However, the Debtor testified that the business account has sometimes been used, allegedly accidentally, to pay for personal expenses. The Debtor testified that DMG did file taxes, but copies of tax returns could not be produced. DMG has also paid its own bills. Tr. 2/28/12 at 70-72. On balance, this factor weighs in favor of piercing the corporate veil.

### *Inadequate capitalization*

Rossiello maintains that DMG was inadequately capitalized. Adequate capitalization is integral to the veil-piercing analysis, particularly in the context of a closely-held corporation. *See Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important

factor in cases denying stockholders their defense of limited liability."); *see also DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684-85 (4th Cir. 1976). The benefit of limited liability for corporate shareholders does not come without responsibility. Typically, corporations that are undercapitalized in such a way as to ensure that entities doing business with the corporation will have no way to recover damages against the corporation will not receive the benefit of limited liability.

> To permit the creation of an inadequately capitalized corporation as a separate entity is incompatible with the concepts underlying an independent existence. Where it is sought on the one hand to make available to general or tort creditors only an illusory amount compared with the size of the business and the public responsibility inherent in its very nature, while on the other hand advancing necessary expenses through secured devices, it would be a gross inequity to allow such a flimsy organization to provide a shield for personal liability. Courts will not tolerate arrangements which throw all the risks on the public and which enable stockholders to reap profits while being insulated against losses. *Mull v. Colt Co.,* 31 F.R.D. 154, 164-65 (S.D.N.Y. 1962) (denying motion to dismiss).

The Debtor testified that as of February 2012, DMG did not have any capital at all. Tr. 2/28/12 at 65. Thus, the Court finds that DMG was not adequately capitalized. As such, this factor weighs in favor of piercing the corporate veil.

### *Personal use of corporate assets*

*i.    Intermingling of Funds between the Debtor and DMG*

Rossiello claims that there were numerous instances when the Debtor intermingled DMG's funds with his personal funds. The Court admitted into evidence, as Exhibits 5 and 6, expense reports created by the Debtor that detailed all of the money received and the expenses incurred by DMG in connection with Easy Street. The expense report admitted as Exhibit 5 was titled "Reconciliation of Expenses" for Easy Street. The expense report admitted as Exhibit 6 was titled "Reconciliation of Funds Received from Bobby San Filipo [sic]." The bank account that contained the funds used to pay the expenses in Exhibits 5-6 was the Easy Street Account.

The expense reports admitted into evidence contained a transfer, in the amount of $143,811.49, from the Easy Street Account to the Debtor's personal savings account dated August 6, 2007. Tr. 2/28/12 at Exhibit 5; *Id.* at 76-77. The Debtor testified that six months prior to the transfer there had been an incident of fraud related to a DMG checking account, which caused TD Bank to begin monitoring the account. Tr. 2/28/12 at 78. The Debtor stated that he made the transfer to his personal savings account because of this fraud that had occurred in connection with the account half a year prior.[9] *Id.* The Debtor claimed that transferring business funds to his personal account would allow him to use his personal debit checking card while he was in Europe on business, without incurring any further problems. Tr. 2/28/12 at 77. When asked why the Debtor had to move the money out of the Easy Street Account if the bank was monitoring it, the Debtor responded that he was concerned that if the account was hacked into, it would take a long time to recover the money. Tr. 2/28/12 at 79. The Debtor testified that the bank told him not to keep a large balance in the Easy Street Account until the bank could determine what was happening with the account. Tr. 2/28/12 at 79. This does not explain, however, why the Debtor transferred the money from Rossiello into this "unsafe" account after the fraudulent activity, or why he transferred the money to his personal account rather than to a different DMG account. The Debtor's explanation for the transfer into his personal account lacks credibility and is not supported by any documentary evidence regarding TD Bank's suggestions.

---

[9] It is not clear from the Debtor's testimony whether the fraudulent activity occurred in connection with the Easy Street Account or some other account held by DMG.

The Debtor testified that upon returning from Europe he transferred $143,000, in a series of transfers over several months, back into DMG's checking account.[10]  Tr. 2/28/12 at 80-81. The Debtor testified that he kept the money in his savings account prior to that time and would only transfer it back to DMG when certain bills had to be paid.  Tr. 2/28/12 at 84.  However, the expense reports provided by the Debtor indicate that only $32,345 was transferred to DMG's business account.  Tr. 2/28/12 at 85.  No bank statements were entered into evidence or produced at the evidentiary hearing to verify what happened to the balance of the money that the Debtor had transferred from the Easy Street Account into his own personal account.  Tr. 2/28/12 at 85-86.  At least $111,466 of the funds deposited into the Easy Street Account were commingled with the Debtor's funds and not returned to the Easy Street Account.  Further, the Debtor failed to offer any credible explanation as to how these funds were used.

The Debtor testified that the funds in the Easy Street Account were used to pay the salaries and expenses for eight people working exclusively on Easy Street for DMG.  Tr. 2/28/12 at 66.  According to the Debtor, eight people were contracted out full time to assist in the preproduction of Easy Street.  Tr. 2/28/12 at 67.  The people who worked on other DMG projects were paid from money provided solely to fund those projects, according to the Debtor.  Tr. 2/28/12 at 67. When the Debtor was asked how the DMG debit card was used, the Debtor responded that it was used to pay for his gas to travel to possible filming locations and for food for the people who were working on the particular project.  Tr. 2/28/12 at 64.

  *ii.*  *Use of Easy Street Account as Personal ATM or Personal Bank*

The Debtor put corporate assets to personal use in other ways.  For example, the Debtor used the Easy Street Account as a personal ATM at times.  Tr. 2/28/12 at Exhibit 5.  The Debtor

---

[10] There is no mention of what happened to any interest that accrued while the money was in the Debtor's personal savings account. The Debtor also failed to explain whether TD Bank declared that the Easy Street Account no longer required monitoring.

would note the description of his expense as "Cash" on his expense report. *Id.* This notation was made numerous times without any explanation as to exactly what the Debtor was paying for with the cash.

### iii. *Conversion of Funds for Personal Use*

According to the Debtor's own expense reports, the Debtor used the money from the Easy Street Account to pay for transportation expenses, movies, groceries, utilities, attorney's fees, gasoline, hotels, pet supplies, doctor bills, meals and entertainment, the full balance of the Debtor's monthly office rent, federal and state income taxes, and other federal and state fees incurred by DMG. Tr. 2/28/12 at Exhibit 5-6. Rossiello alleges that she never authorized the Debtor to use her funds to pay for 100% of the costs of operating the Debtor's office, particularly when DMG simultaneously had other ongoing projects with other clients. Tr. 2/28/12 at 55, 72. The Debtor testified, however, that all of the meal and restaurant charges on the Easy Street Account were related to the production of Easy Street, and thus, that the Debtor was justified in using the Easy Street Account to pay for them. Tr. 2/28/12 at 92. The Debtor also testified that any charges for pet supplies or other personal charges on the Easy Street Account were instances of him accidentally charging the Easy Street Account instead of his personal account as a result of mixing up his debit cards. Tr. 2/28/12 at 92.

It is clear that the Debtor and Rossiello disagree over whether each expenditure from the Easy Street Account was legitimate and authorized. However, due to the absence of any written agreement between the parties as to exactly how Rossiello's funds could be used, this Court refrains from making a determination as to whether each expense was appropriate and legitimate. The Court is not making any finding as to the validity of individual expenses. The issue at this point is whether the corporation was

dominated such that the corporate veil should be pierced. Since funds were commingled between personal and business accounts with no apparent legitimate business reason, this factor weighs heavily in favor of piercing the corporate veil.

***Overlap in ownership, officers, directors; common office space; amount of business discretion displayed by the allegedly dominated corporation; whether the corporation had property that was used by others as if it were its own***

The Debtor and his wife are the sole members of DMG. Tr. 2/28/12 at 58. Each is a 50% owner of DMG. Tr. 2/28/12 at 58. There are no other shareholders or stockholders of DMG. Tr. 2/28/12 at 58. The Debtor's wife, however, is not an active member of DMG. Tr. 2/28/12 at 59. The Debtor's wife only receives money from DMG if there is extra money in the company at the end of the year. Tr. 2/28/12 at 59. The Debtor's wife does not invest any money in DMG. Tr. 2/28/12 at 60.

DMG does not have any officers or directors. Tr. 2/28/12 at 62. The Debtor is DMG's sole employee. Tr. 2/28/12 at 62-63. All business decisions of DMG or for DMG are made by the Debtor. *See* Tr. 2/28/12 at 62-63.

The office of DMG is located in the Debtor's home. Tr. 2/28/12 at 61. DMG's office is not in an attached part of the house; instead, it is actually in a room in the Debtor's house. *See* Tr. 2/28/12 at 61. In fact, the room is used as DMG's office and also as a personal study room for the Debtor. Tr. 2/28/12 at 61.

It is undisputed that the Debtor, for all practical purposes, is the sole member, manager, and employee of DMG. It is undisputed that the Debtor was the sole decision-maker for DMG. In the case of closely-held corporations, these facts are not uncommon, and often create a scenario where a sole principal dominates corporate decision-making. As such, these facts are neutral in the context of closely-held corporations and are not enough to pierce the corporate

veil. *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989) (application of domination factors to small privately held corporations can be difficult "where the trappings of sophisticated corporate life are rarely present"). These factors must be considered in the context of other factors showing domination of DMG by the Debtor, and the abuse of "the privilege of doing business in the corporate form to perpetrate a wrong or injustice." *See Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142 (1993).

### *Whether the Related Corporations were treated as independent profit centers; Payment or guarantee of debts of the Corporation by other Corporations in the Group*

DMG does not have any corporate parents or subsidiaries. Therefore, this element is not applicable.

Based on the totality of the record it is clear that the Debtor dominated and controlled DMG. However, domination is but a piece of the puzzle and is not, by itself, a basis to pierce the veil and eliminate the benefits of corporate ownership. It must also be proven that the Debtor's domination was used to commit "a wrongful or unjust act." *Id.* at 141-42. As a matter of New York law, this Court cannot pierce the corporate veil unless there has been wrongdoing toward the plaintiff.

The harm alleged by Rossiello is that the Debtor used DMG to defraud Rossiello, or at least used DMG to convert her funds for his own personal use. The Court has examined DMG's conduct and finds that DMG did commit a wrong against Rossiello. Since this Court also found that the Debtor dominated DMG, the Court's analysis of the second prong of the piercing standard will be determinative in the Court's consideration of whether to pierce the corporate veil to hold the Debtor liable for the wrong committed by DMG.

The totality of the circumstances surrounding this case show that the Debtor, as the sole actor on behalf of DMG, abused the corporate form by wrongfully causing DMG to transfer money to the Debtor for the Debtor's own benefit.  This Court believes that this is the type of conduct for which the Debtor should not be insulated from liability by utilizing the protection of DMG, and is what the veil-piercing theory, developed under New York law, was designed to protect against.  The Court finds that Rossiello has sustained her burden, as the Debtor dominated DMG and used DMG to commit a wrongful act against Rossiello.  Therefore, the corporate veil shall be pierced and the Debtor shall be liable for the wrongdoing of DMG.

*Conclusion*

For the foregoing reasons, the Court finds that the corporate veil should be pierced and the Debtor is liable for DMG's obligations to Rossiello.  This Memorandum Decision does not make any findings as to the amount of Rossiello's claim or whether the claim should be discharged.  Having determined that the Debtor is liable for DMG's obligations to Rossiello, Rossiello shall be entitled to file a proof of claim in this case, to which the Debtor may object as to the amount.

Dated: Central Islip, New York
     January 17, 2013          ___*/s/ Robert E. Grossman*_____
                                    Hon. Robert E. Grossman, U.S.B.J.